JS 44  (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States inSeptember 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
GEORGE ANDRIE and MARY LOU ANDRIE, h/w

## DEFENDANTS
NATIONAL FOOTBALL LEAGUE, et al.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   New York, NY
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gene Locks, Locks Law Firm, 601 Walnut Street, Suite 720 East,
Philadelphia, PA 19106, (215) 893-0100

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332
Brief description of cause:
Other Personal Injury

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $  in excess of $5 million

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   Anita Brody
DOCKET NUMBER   12-cv-262 & 12-cv-324

DATE
09/04/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| George Andrie and Mary Lou Andrie, h/w et al. | : | CIVIL ACTION |
| v. | : | |
| **National Football League, et al.** | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.                     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)                     (XX)

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( )

| 9/4/2012 | Gene Locks, Esquire | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 893-3434 | (215) 893-3444 | glocks@lockslaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA --- DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: 26356 E. Zeerip Drive, Drummond Island, MI 49726

Address of Defendant: 345 Park Avenue, New York, NY  10017

Place of Accident, Incident or Transaction: _____
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))      Yes☐  No☒

Does this case involve multidistrict litigation possibilities?      Yes☐  No☒
*RELATED CASE, IF ANY:*  12-cv-00324
Case Number: 12-cv-00262      Judge Anita Brody      Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
      Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
      Yes☒  No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
      Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
      Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
    (Please specify)

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Gene Locks, counsel of record do hereby certify:
☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: 9/4/12      Gene Locks      12969
      Attorney-at-Law      Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____      _____      _____
      Attorney-at-Law      Attorney I.D.#

CIV. 609 (6/08)

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GEORGE ANDRIE, MARY LOU ANDRIE,      :
ROSS BRUPBACHER,                     :
BARBARA BRUPBACHER,                  :
JAMES GIBBONS, GAYLE GIBBONS,        :
JOE ARMENTROUT, PAM ARMENTROUT,      :     CIVIL ACTION NO:_____
HAROLD C. BAILEY, JONI R. BAILEY,    :
COLEMAN BELL, II, INGRID BELL,       :     COMPLAINT
FRANK BERNARDI, SUSIE BERNARDI,      :
HANK BJORKLUND,                      :     JURY TRIAL DEMANDED
VICTORIA B. BJORKLUND,               :
WILLIE BLACKWELL, KATHY BLACKWELL,   :
GARLAND DEAN BOYETTE,                :
WINETTA B. BOYETTE,                  :
JAMES BROWN, RENEE BROWN,            :
BILL CAPECE,                         :
WILLIE CLAY, RAYSHAWN CLAY,          :
REUBEN DAVIS,                        :
ROD DAVIS, BLOSSOM DAVIS,            :
JEFF DELANEY, VERONICA DELANEY,      :
ALAN DIXON, BELINDA DIXON,           :
RICHARD D. DRUSCHEL,                 :
 PAMELA DRUSCHEL,                    :
THOMAS EHLERS, GWEN EHLERS,          :
TERRY L. FALCON, BECKY FALCON,       :
DAVID FOLEY, LINDA FOLEY,            :
DONALD J. GAULT, MARY LOU GAULT,     :
MICHAEL HAMBY, DEBBIE HAMBY,         :
BOB HARRIS, EMILY HARRIS,            :
THOMAS HAYNES, MAILE HAYNES,         :
DOUGLAS HOLLIE, SHARON HOLLIE,       :
DAVID HUBBARD, MELINDA HUBBARD,      :
ROGER JACKSON,                       :
ROLAND PO JAMES,                     :
JEFF JORDAN, MERILEE JORDAN,         :
TODD KALIS, KRISTEN KALIS,           :
DAN LAND, THERESA LAND,              :
JOEY LAROCQUE,                       :
JEREMY LINCOLN,                      :
RANDY MARSHALL,                      :
JOHN MCCAMBRIDGE,                    :
CHRISTINE MCCAMBRIDGE,               :
RANDY MCCLANAHAN,                    :

JACKIE MCCLANAHAN,                                  :
BRIAN T. MCCONNELL, PIER MCCONNELL,                 :
SCOTT MCGARRAHAN,                                   :
LINDSAY MCGARRAHAN,                                 :
GUIDO MERKENS,                                      :
BRUCE MESNER, CANDACE MESNER,                       :
ALTON MONTGOMERY, JR.,                              :
CONNIE K. MONTGOMERY,                               :
LLOYD MUMPHORD,                                     :
JIM OSBORNE, WANDA OSBORNE,                         :
BARRY PEARSON, LINDA PEARSON,                       :
DANNY PITTMAN, KAREN PITTMAN,                       :
ROB PORTER,                                         :
SHELTON ROBINSON,                                   :
TERRY SCHMIDT, NANCY SCHMIDT,                       :
MICHAEL ST. CLAIR,                                  :
RAY SYDNOR, PATRICIA SYDNOR,                        :
HURLEY J. TARVER, JR.,                              :
BILLY TAYLOR,                                       :
STEPHEN THOMPSON,                                   :
STARLA RAE THOMPSON,                                :
STEPHEN TREJO,                                      :
JEFFRY C. TUPPER, JOHNNA TUPPER,                    :
RICHARD H. TYSON, THERESA W. TYSON,                 :
JIM WALSH, MARIE WALSH,                             :
JEFF WEST, KATHY WEST                               :
                                                    :
        PLAINTIFFS,                                 :
                                                    :
        v.                                          :
                                                    :
                                                    :
NATIONAL FOOTBALL LEAGUE,                           :
NFL PROPERTIES LLC, and                             :
JOHN DOES 1 through 100, inclusive,                 :
                                                    :
        DEFENDANTS.                                 :

## COMPLAINT

        The Plaintiffs set forth above in the case caption bring this Complaint and state as

follows:

        1.      This action seeks a declaration of liability, injunctive relief, and financial

compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses

suffered by the Plaintiffs and their spouses as a result of the defendants' intentional tortious misconduct (by voluntary undertaking), negligence, fraud, and conspiracy.

2.     This action arises from the pathological and debilitating effects of head injuries and concussions that have afflicted present and former professional football players in the National Football League (the "NFL").  For many decades, evidence has linked repetitive traumatic brain injury to long-term neurological problems in many sports.  The NFL, as the organizer, marketer, and face of the most popular sport in the United States, in which head trauma is a regular occurrence, was aware of the evidence and the risks associated with repetitive traumatic brain injuries and concussions for decades, but deliberately ignored and actively concealed the information from the Plaintiffs and all others who participated in organized football at all levels.

3.     Moreover, in or around 1994 and possibly earlier, the NFL voluntarily inserted itself into the scientific research and discussion concerning the relationship between mild traumatic brain injury and short-term and long-term impairment of the brain.  In doing so, the NFL carried on its voluntary leadership in all aspects of the game of football.  The NFL, however, then intentionally and fraudulently mislead present and former players, and all people who reasonably rely upon the NFL's expertise about its own sport, regarding the short-term and long-term risks posed by concussions and head trauma.

4.     Rather than warn players that they risked permanent brain injury if they returned to play too soon after sustaining a concussion, the NFL produced industry-funded, biased research and advocacy that actively misrepresented that concussions and subconcussive head impacts do not (or may not) present serious, life-altering risks.

5.      The NFL, through its own initiative and voluntary undertaking, created the Mild Traumatic Brain Injury Committee (the "MTBI Committee") in 1994 to research and ameliorate the impact of concussions on NFL players.  Notwithstanding this purported purpose, and despite clear medical evidence that on-field concussions led directly to brain injuries with tragic results for players at every level of the sport, the NFL failed to inform its current and former players of the true risks associated with such head trauma and purposefully misrepresented and/or concealed medical evidence on that issue.

6.      Athletes who suffered repetitive traumatic brain injuries and/or concussions in other professional sports were restricted from playing full games or even seasons, yet NFL players who had similar trauma were regularly returned to play, both before 1994 and after.

7.      The NFL's active and purposeful concealment and misrepresentation of the severe neurological risks of repetitive traumatic brain injury exposed players to dangers they could have avoided had the NFL provided them with truthful and accurate information. Many of these players have suffered brain damage and latent neurodegenerative disorders and diseases as a result of the NFL's acts and/or omissions.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and (b) and 28 U.S.C. § 1332(d)(11).  All of the plaintiffs and all of the defendants are citizens of different states.  The amount in controversy exceeds $75,000, exclusive of interest and costs for each Plaintiff.  The amount in controversy for all Plaintiffs in this mass action exceeds five million dollars ($5,000,000) exclusive of interest and costs.  This matter can be tried jointly in that the Plaintiffs claims involve common questions of law and fact.

9.     This Court has personal jurisdiction over the Defendants because they conduct substantial and continuous business in the Commonwealth of Pennsylvania.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) and (b)(2), because a substantial part of the events or omissions that give rise to the claims occurred within the Commonwealth of Pennsylvania and this district, and the Defendants conduct a substantial part of their business within this district.

## PARTIES

11.     Plaintiff George Andrie is 72 years old and a former NFL defensive end who resides with his wife Mary Lou Andrie in Drummond Island, Michigan. Mr. Andrie played in the NFL from 1962 through 1972 for the Dallas Cowboys. During his NFL career, Mr. Andrie sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Andrie suffers from various neurological conditions and symptoms related to the multiple head traumas.

12.     Plaintiff Ross Brupbacher is 64 years old and a former NFL linebacker and special teams player who resides with his wife Barbara Brupbacher in Lafayette, Louisiana. Mr. Brupbacher played in the NFL from 1970 through 1972 and in 1976 for the Chicago Bears. During his NFL career, Mr. Brupbacher sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Brupbacher suffers from various neurological conditions and symptoms related to the multiple head traumas.

13.     Plaintiff James Gibbons is 75 years old and a former NFL tight end who resides with his wife Gayle Gibbons in Palm Desert, California. Mr. Gibbons played in the NFL from 1958 through 1968 for the Cleveland Browns and Detroit Lions. During his NFL career, Mr. Gibbons sustained repetitive traumatic impacts to his head and/or concussions on multiple

occasions. Currently, Mr. Gibbons suffers from various neurological conditions and symptoms related to the multiple head traumas.

14.     Plaintiff Joe Armentrout is 47 years old and a former NFL running back who resides with his wife Pam Armentrout in Verona, Wisconsin. Mr. Armentrout played in the NFL from 1987 through 1989 for the Tampa Bay Buccaneers, Los Angeles Rams and Green Bay Packers. During his NFL career, Mr. Armentrout sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Armentrout suffers from various neurological conditions and symptoms related to the multiple head traumas.

15.     Plaintiff Harold C. Bailey is 54 years old and a former NFL wide receiver and special teams player who resides with his wife Joni R. Bailey in Katy, Texas. Mr. Bailey played in the NFL from 1980 through 1984 for the Houston Oilers. During his NFL career, Mr. Bailey sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Bailey suffers from various neurological conditions and symptoms related to the multiple head traumas.

16.     Plaintiff Coleman Bell, II is 42 years old and a former NFL tight end who resides with his wife Ingrid Bell in Land O Lakes, Florida. Mr. Bell played in the NFL from 1993 through 1996 Dallas Cowboys, Washington Redskins and Seattle Seahawks. During his NFL career, Mr. Bell sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Bell suffers from various neurological conditions and symptoms related to the multiple head traumas.

17.     Plaintiff Frank Bernardi is 79 years old and a former NFL cornerback and special teams player who resides with his wife Susie Bernardi in Broomfield, Colorado. Mr. Bernardi played in the NFL from 1955 through 1958 and in 1960 for the Chicago Cardinals and

Denver Broncos.  During his NFL career, Mr. Bernardi sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Bernardi suffers from various neurological conditions and symptoms related to the multiple head traumas.

18.     Plaintiff Hank Bjorklund is 62 years old and a former NFL running back and special teams player who resides with his wife Victoria B. Bjorklund in Plandome Manor, New York.  Mr. Bjorklund played in the NFL from 1972 through 1974 for the New York Jets. During his NFL career, Mr. Bjorklund sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Bjorklund suffers from various neurological conditions and symptoms related to the multiple head traumas.

19.     Plaintiff Willie Blackwell is 57 years old and a former NFL outside linebacker who resides with his wife Kathy Blackwell in McDonough, Georgia.  Mr. Blackwell played in the NFL from 1977 through 1978 and in 1980 for the Washington Redskins, Buffalo Bills and Kansas City Chiefs.  During his NFL career, Mr. Blackwell sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Blackwell suffers from various neurological conditions and symptoms related to the multiple head traumas.

20.     Plaintiff Garland Dean Boyette is 73 years old and a former NFL linebacker who resides with his wife Winetta B. Boyette in Missouri City, Texas.  Mr. Boyette played in the NFL from 1962 through 1964 and from 1966 through 1974 for the St. Louis Cardinals and Houston Oilers.  During his NFL career, Mr. Boyette sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Boyette suffers from various neurological conditions and symptoms related to the multiple head traumas.

21.     Plaintiff James Brown is 45 years old and a former NFL defensive back who resides with his wife Renee Brown in Bowie, Maryland.  Mr. Brown played in the NFL from 1989 through 2000 for the Miami Dolphins, Pittsburgh Steelers, Arizona Cardinals and Detroit Lions.  During his NFL career, Mr. Brown sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Brown suffers from various neurological conditions and symptoms related to the multiple head traumas.

22.     Plaintiff Bill Capece is 53 years old and a former NFL kicker who resides in Tallahassee, Florida.  Mr. Capece played in the NFL from 1981 through 1984 for the Houston Oilers and Tampa Bay Buccaneers.  During his NFL career, Mr. Capece sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Capece suffers from various neurological conditions and symptoms related to the multiple head traumas.

23.     Plaintiff Willie Clay is 41 years old and a former NFL cornerback and safety who resides with his wife Rayshawn Clay in Lithonia, Georgia.  Mr. Clay played in the NFL from 1991 through 1999 for the Detroit Lions, New England Patriots and New Orleans Saints.  During his NFL career, Mr. Clay sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Clay suffers from various neurological conditions and symptoms related to the multiple head traumas.

24.     Plaintiff Reuben Davis is 47 years old and a former NFL defensive end, defensive tackle and nose guard who resides in Greensboro, North Carolina.  Mr. Davis played in the NFL from 1988 through 1999 for the Tampa Bay Buccaneers, Phoenix Cardinals and San Diego Chargers.  During his NFL career, Mr. Davis sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Davis suffers from various neurological conditions and symptoms related to the multiple head traumas.

25.     Plaintiff Rod Davis is 31 years old and a former NFL linebacker who resides with his wife Blossom Davis in Brandon, Mississippi.  Mr. Davis played in the NFL from 2004 through 2006 for the Minnesota Vikings and Carolina Panthers.  During his NFL career, Mr. Davis sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Davis suffers from various neurological conditions and symptoms related to the multiple head traumas.

26.     Plaintiff Jeff Delaney is 55 years old and a former NFL strong safety who resides with his wife Veronica Delaney in McMurray, Pennsylvania.  Mr. Delaney played in the NFL from 1979 through 1983 for the Los Angeles Rams, Detroit Lions, Tampa Bay Buccaneers and Baltimore Colts.  During his NFL career, Mr. Delaney sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Delaney suffers from various neurological conditions and symptoms related to the multiple head traumas.

27.     Plaintiff Alan Dixon is 61 years old and a former NFL running back who resides with his wife Belinda Dixon in Fitzgerald, Georgia.  Mr. Dixon played in the NFL from 1974 through 1976 for the Minnesota Vikings.  During his NFL career, Mr. Dixon sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Dixon suffers from various neurological conditions and symptoms related to the multiple head traumas.

28.     Plaintiff Richard D. Druschel is 60 years old and a former NFL offensive lineman who resides with his wife Pamela Druschel in Greensburg, Pennsylvania.  Mr. Druschel played in the NFL in 1974 for the Pittsburgh Steelers.  During his NFL career, Mr. Druschel sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.

Currently, Mr. Druschel suffers from various neurological conditions and symptoms related to the multiple head traumas.

29. Plaintiff Thomas Ehlers is 60 years old and a former NFL linebacker and special teams player who resides with his wife Gwen Ehlers in Mishawaka, Indiana. Mr. Ehlers played in the NFL from 1975 through 1980 for the Philadelphia Eagles and Buffalo Bills. During his NFL career, Mr. Ehlers sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Ehlers suffers from various neurological conditions and symptoms related to the multiple head traumas.

30. Plaintiff Terry L. Falcon is 57 years old and a former NFL offensive guard, tackle and special teams player who resides with his wife Becky Falcon in Florence, Montana. Mr. Falcon played in the NFL from 1978 through 1981 for the New England Patriots and New York Giants. During his NFL career, Mr. Falcon sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Falcon suffers from various neurological conditions and symptoms related to the multiple head traumas.

31. Plaintiff David Foley is 64 years old and a former NFL offensive tackle who resides with his wife Linda Foley in Springfield, Ohio. Mr. Foley played in the NFL from 1969 through 1977 for the New York Jets and Buffalo Bills. During his NFL career, Mr. Foley sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Foley suffers from various neurological conditions and symptoms related to the multiple head traumas.

32. Plaintiff Donald J. Gault is 66 years old and a former NFL quarterback who resides with his wife Mary Lou Gault in Heathrow, Florida. Mr. Gault played in the NFL from 1968 through 1972 for the Cleveland Browns and New York Jets. During his NFL career,

Mr. Gault sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Gault suffers from various neurological conditions and symptoms related to the multiple head traumas.

33.     Plaintiff Michael Hamby is 49 years old and a former NFL defensive end who resides with his wife Debbie Hamby in Orchard Park, New York. Mr. Hamby played in the NFL from 1985 through 1989 for the Buffalo Bills. During his NFL career, Mr. Hamby sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Hamby suffers from various neurological conditions and symptoms related to the multiple head traumas.

34.     Plaintiff Bob Harris is 51 years old and a former NFL linebacker and special teams player who resides with his wife Emily Harris in Florence, Alabama. Mr. Harris played in the NFL from 1983 through 1987 for the St. Louis Cardinals and Kansas City Chiefs. During his NFL career, Mr. Harris sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Harris suffers from various neurological conditions and symptoms related to the multiple head traumas.

35.     Plaintiff Thomas Haynes is 49 years old and a former NFL defensive back and special teams player who resides with his wife Maile Haynes in Covina, California. Mr. Haynes played in the NFL from 1986 through 1988 for the Dallas Cowboys and Los Angeles Rams. During his NFL career, Mr. Haynes sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Haynes suffers from various neurological conditions and symptoms related to the multiple head traumas.

36.     Plaintiff Douglas Hollie is 51 years old and a former NFL defensive end who resides with his wife Sharon Hollie in Dublin, California. Mr. Hollie played in the NFL in

-11-

1985 and from 1988 through 1989 with the Detroit Lions and Seattle Seahawks. During his NFL career, Mr. Hollie sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Hollie suffers from various neurological conditions and symptoms related to the multiple head traumas.

37.     Plaintiff David Hubbard is 56 years old and a former NFL offensive tackle, guard, center and special teams player who resides with his wife Melinda Hubbard in Marietta, Georgia. Mr. Hubbard played in the NFL from 1977 through 1978 for the New Orleans Saints. During his NFL career, Mr. Hubbard sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Hubbard suffers from various neurological conditions and symptoms related to the multiple head traumas.

38.     Plaintiff Roger Jackson is 53 years old and a former NFL free safety, strong safety, cornerback and linebacker who resides in Macon, Georgia. Mr. Jackson played in the NFL from 1982 through 1985 and in 1987 for the Denver Broncos. During his NFL career, Mr. Jackson sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Jackson suffers from various neurological conditions and symptoms related to the multiple head traumas.

39.     Plaintiff Ronald Po James is 63 years old and a former NFL running back who resides in Wilmington, Delaware. Mr. James played in the NFL from 1972 through 1977 for the Philadelphia Eagles and Seattle Seahawks. During his NFL career, Mr. James sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. James suffers from various neurological conditions and symptoms related to the multiple head traumas.

40.     Plaintiff Jeff Jordan is 67 years old and a former NFL running back and special teams player who resides with his wife Merilee Jordan in Seattle, Washington. Mr. Jordan played in the NFL from 1967 through 1972 for the Los Angeles Rams and Washington Redskins. During his NFL career, Mr. Jordan sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Jordan suffers from various neurological conditions and symptoms related to the multiple head traumas.

41.     Plaintiff Todd Kalis is 47 years old and a former NFL offensive lineman, tackle and guard who resides with his wife Kristen Kalis in Cranberry Townships, Pennsylvania. Mr. Kalis played in the NFL from 1988 through 1995 for the Minnesota Vikings, Pittsburgh Steelers and Cincinnati Bengals. During his NFL career, Mr. Kalis sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Kalis suffers from various neurological conditions and symptoms related to the multiple head traumas.

42.     Plaintiff Dan Land is 47 years old and a former NFL running back and defensive back who resides with his wife Theresa Land in Albany, Georgia. Mr. Land played in the NFL from 1987 through 1997 for the Tampa Bay Buccaneers, Atlanta Falcons, Los Angeles Raiders and Oakland Raiders. During his NFL career, Mr. Land sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Land suffers from various neurological conditions and symptoms related to the multiple head traumas.

43.     Plaintiff Joey LaRocque is 26 years old and a former NFL linebacker and special teams player who resides in Agoura Hills, California. Mr. LaRocque played in the NFL from 2008 through 2009 and in 2011 for the Chicago Bears and New York Jets. During his NFL career, Mr. LaRocque sustained repetitive traumatic impacts to his head and/or concussions on

multiple occasions.  Currently, Mr. LaRocque suffers from various neurological conditions and symptoms related to the multiple head traumas.

44.     Plaintiff Jeremy Lincoln is 43 years old and a former NFL cornerback who resides in Miami, Florida.  Mr. Lincoln played in the NFL from 1992 through 2000 for the Chicago Bears, St. Louis Rams, Seattle Seahawks, New York Giants and Detroit Lions.  During his NFL career, Mr. Lincoln sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Lincoln suffers from various neurological conditions and symptoms related to the multiple head traumas.

45.     Plaintiff Randy Marshall is 65 years old and a former NFL defensive end and defensive tackle who resides in Wamic, Oregon.  Mr. Marshall played in the NFL from 1970 through 1972 for the Atlanta Falcons.  During his NFL career, Mr. Marshall sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Marshall suffers from various neurological conditions and symptoms related to the multiple head traumas.

46.     Plaintiff John McCambridge is 67 years old and a former NFL defensive end and linebacker who resides with his wife Christine McCambridge in Lakeway, Texas.  Mr. McCambridge played in the NFL from 1967 through 1970 for the Detroit Lions and Kansas City Chiefs.  During his NFL career, Mr. McCambridge sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. McCambridge suffers from various neurological conditions and symptoms related to the multiple head traumas.

47.     Plaintiff Randy McClanahan is 57 years old and a former NFL inside linebacker and special teams player who resides with his wife Jackie McClanahan in Peoria, Arizona.  Mr. McClanahan played in the NFL from 1977 through 1978 and from 1980 through 1982 for the Oakland Raiders, Buffalo Bills and Los Angeles Raiders.  During his NFL career,

Mr. McClanahan sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. McClanahan suffers from various neurological conditions and symptoms related to the multiple head traumas.

48.     Plaintiff Brian T. McConnell is 62 years old and a former NFL tight end and linebacker who resides with his wife Pier McConnell in Danville, California. Mr. McConnell played in the NFL from 1973 through 1975 for the Buffalo Bills, Houston Oilers and Miami Dolphins. During his NFL career, Mr. McConnell sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. McConnell suffers from various neurological conditions and symptoms related to the multiple head traumas.

49.     Plaintiff Scott McGarrahan is 38 years old and a former NFL safety who resides with his wife Lindsay McGarrahan in Austin, Texas. Mr. McGarrahan played in the NFL from 1998 through 2005 for the Green Bay Packers, Miami Dolphins, Tennessee Titans and San Diego Chargers. During his NFL career, Mr. McGarrahan sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. McGarrahan suffers from various neurological conditions and symptoms related to the multiple head traumas.

50.     Plaintiff Guido Merkens is 56 years old and a former NFL safety, quarterback, wide receiver and special teams player who resides in Huntsville, Texas. Mr. Merkens played in the NFL from 1978 through 1987 for the Houston Oilers, New Orleans Saints and Philadelphia Eagles. During his NFL career, Mr. Merkens sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Merkens suffers from various neurological conditions and symptoms related to the multiple head traumas.

51.     Plaintiff Bruce Mesner is 48 years old and a former NFL nose tackle and defensive end who resides with his wife Candace Mesner in Boca Raton, Florida. Mr. Mesner

played in the NFL from 1987 through 1989 for the Buffalo Bills.  During his NFL career, Mr. Mesner sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Mesner suffers from various neurological conditions and symptoms related to the multiple head traumas.

52.     Plaintiff Alton Montgomery, Jr. is 45 years old and a former NFL cornerback, safety, linebacker and special teams player who resides with his wife Connie K. Montgomery in Kathleen, Georgia.  Mr. Montgomery played in the NFL from 1990 through 1995 for the Denver Broncos and Atlanta Falcons.  During his NFL career, Mr. Montgomery sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Montgomery suffers from various neurological conditions and symptoms related to the multiple head traumas.

53.     Plaintiff Lloyd Mumphord is 65 years old and a former NFL cornerback and special teams player who resides in Opelousas, Louisiana.  Mr. Mumphord played in the NFL from 1969 through 1978 for the Miami Dolphins and Baltimore Colts.  During his NFL career, Mr. Mumphord sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Mumphord suffers from various neurological conditions and symptoms related to the multiple head traumas.

54.     Plaintiff Jim Osborne is 62 years old and a former NFL defensive tackle who resides with his wife Wanda Osborne in Algonquin, Illinois.  Mr. Osborne played in the NFL from 1972 through 1984 for the Chicago Bears.  During his NFL career, Mr. Osborne sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Osborne suffers from various neurological conditions and symptoms related to the multiple head traumas.

55.     Plaintiff Barry Pearson is 62 years old and a former NFL wide receiver who resides with his wife Linda Pearson in West Simsbury, Connecticut. Mr. Pearson played in the NFL from 1972 through 1976 for the Pittsburgh Steelers and Kansas City Chiefs. During his NFL career, Mr. Pearson sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Pearson suffers from various neurological conditions and symptoms related to the multiple head traumas.

56.     Plaintiff Danny Pittman is 54 years old and a former NFL wide receiver who resides with his wife Karen Pittman in Gilbert, Arizona. Mr. Pittman played in the NFL from 1980 through 1985 for the New York Giants and St. Louis Cardinals. During his NFL career, Mr. Pittman sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Pittman suffers from various neurological conditions and symptoms related to the multiple head traumas.

57.     Plaintiff Rob Porter is 50 years old and a former NFL strong safety and free safety who resides in Laveen, Arizona. Mr. Porter played in the NFL from 1984 through 1985 and in 1987 for the Kansas City Chiefs and New York Giants. During his NFL career, Mr. Porter sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Porter suffers from various neurological conditions and symptoms related to the multiple head traumas.

58.     Plaintiff Shelton Robinson is 51 years old and a former NFL middle linebacker who resides in Bothell, Washington. Mr. Robinson played in the NFL from 1982 through 1988 for the Seattle Seahawks and Detroit Lions. During his NFL career, Mr. Robinson sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.

-17-

Currently, Mr. Robinson suffers from various neurological conditions and symptoms related to the multiple head traumas.

59.     Plaintiff Terry Schmidt is 60 years old and a former NFL defensive back who resides with his wife Nancy Schmidt in Green Mountain, North Carolina. Mr. Schmidt played in the NFL from 1974 through 1984 for the New Orleans Saints and Chicago Bears. During his NFL career, Mr. Schmidt sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Schmidt suffers from various neurological conditions and symptoms related to the multiple head traumas.

60.     Plaintiff Michael St. Clair is 58 years old and a former NFL defensive lineman who resides in Cincinnati, Ohio. Mr. St. Clair played in the NFL from 1976 through 1982 for the Cleveland Browns and Cincinnati Bengals. During his NFL career, Mr. St. Clair sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. St. Clair suffers from various neurological conditions and symptoms related to the multiple head traumas.

61.     Plaintiff Ray Sydnor is 54 years old and a former NFL tight end and wide receiver who resides with his wife Patricia Sydnor in Havre De Grace, Maryland. Mr. Sydnor played in the NFL from 1980 through 1980 for the Pittsburgh Steelers and Philadelphia Eagles. During his NFL career, Mr. Sydnor sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Sydnor suffers from various neurological conditions and symptoms related to the multiple head traumas.

62.     Plaintiff Hurley J. Tarver, Jr. is 36 years old and a former NFL cornerback and special teams player who resides in Tampa, Florida. Mr. Tarver played in the NFL from 1998 through 2002 for the San Francisco 49ers, Cleveland Browns, Dallas Cowboys and Green Bay

-18-

Packers. During his NFL career, Mr. Tarver sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Tarver suffers from various neurological conditions and symptoms related to the multiple head traumas.

63.     Plaintiff Billy Taylor is 55 years old and a former NFL running back who resides in Jersey City, New Jersey. Mr. Taylor played in the NFL from 1978 through 1982 for the New York Giants and Los Angeles Raiders. During his NFL career, Mr. Taylor sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Taylor suffers from various neurological conditions and symptoms related to the multiple head traumas.

64.     Plaintiff Stephen Thompson is 67 years old and a former NFL defensive end and tackle who resides with his wife Starla Rae Thompson in Lake Stevens, Washington. Mr. Thompson ton played in the NFL from 1968 through 1970 and from 1972 through 1973 for the New York Jets. During his NFL career, Mr. Thompson sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Thompson suffers from various neurological conditions and symptoms related to the multiple head traumas.

65.     Plaintiff Stephen Trejo is 34 years old and a former NFL fullback, tight end and special teams player who resides in Gilbert, Arizona. Mr. Trejo ton played in the NFL from 2001 through 2005 for the Detroit Lions. During his NFL career, Mr. Trejo sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Trejo suffers from various neurological conditions and symptoms related to the multiple head traumas.

66.     Plaintiff Jeffry C. Tupper is 49 years old and a former NFL defensive lineman who resides with his wife Johnna Tupper in Stilwell, Kansas. Mr. Tupper ton played in the NFL from 1986 through 1988 for the St. Louis Cardinals, Philadelphia Eagles, Denver Broncos and Kansas City Chiefs. During his NFL career, Mr. Tupper sustained repetitive traumatic impacts to his

head and/or concussions on multiple occasions. Currently, Mr. Tupper suffers from various neurological conditions and symptoms related to the multiple head traumas.

67.     Plaintiff Richard H. Tyson is 69 years old and a former NFL offensive guard who resides with his wife Theresa W. Tyson in Kansas City, Kansas. Mr. Tyson ton played in the NFL from 1966 through 1969 for the Oakland Raiders, Denver Broncos and Buffalo Bills. During his NFL career, Mr. Tyson sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Tyson suffers from various neurological conditions and symptoms related to the multiple head traumas.

68.     Plaintiff Jim Walsh is 55 years old and a former NFL fullback and special teams player who resides with his wife Marie Walsh in Eureka, Missouri. Mr. Walsh ton played in the NFL from 1980 through 1981 for the Buffalo Bills, New York Giants and Seattle Seahawks. During his NFL career, Mr. Walsh sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Walsh suffers from various neurological conditions and symptoms related to the multiple head traumas.

69.     Plaintiff Jeff West is 59 years old and a former NFL punter and tight end who resides with his wife Kathy West in Redmond, Washington. Mr. West played in the NFL from 1975 through 1979 and from 1981 through 1985 for the St. Louis Cardinals, San Diego Chargers and Seattle Seahawks. During his NFL career, Mr. West sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. West suffers from various neurological conditions and symptoms related to the multiple head traumas.

70.     All Defendants, and each of them, were in some fashion legally responsible for the injuries and damages complained of herein.

71.     At all times herein mentioned, Defendants, and each of them, were the agents, servants, and employees each of the other, acting within the course and scope of said agency and employment.

72.     Defendant NFL, which maintains its offices at 345 Park Avenue, New York, NY 10017, is an unincorporated association consisting of the 32 separately owned and independently-operated professional football teams listed below.  The NFL is engaged in interstate commerce in the business of, among other things, promoting, operating, organizing, and regulating the major professional football league in the United States.  The NFL is not, and has not, been the employer of the Plaintiffs, who were employed during their respective careers in professional football by the independent clubs (hereinafter "Teams" or "Clubs") set forth below.  The United States Supreme Court held in *American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212-13 (2010) that each team that is a member of the NFL is a legally distinct and separate entity from both the other teams and the NFL itself.

73.     The 32 separately owned and independently-operated teams are:

| NFL Team Owner | State of Organization | Team Name (City) |
|---|---|---|
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |

| | | |
|---|---|---|
| Cleveland Browns, Inc. | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars, Ltd. | Florida | Jacksonville Jaguars |
| Kansas City Chief Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |

| Buccaneers Limited Partners | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football Inc. | Maryland | Washington Redskins |

74.     Defendant NFL Properties, LLC is the successor-in-interest to National Football League Properties, Inc. ("NFL Properties") and a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York.  NFL Properties is engaged in, among other activities, approving, licensing, and promoting equipment used by all the NFL teams.  NFL Properties regularly conducts business in Pennsylvania.

75.     All Defendants, including the National Football League and NFL Properties, shall be referred to collectively herein as the "NFL".

76.     The NFL caused or contributed to the injuries and increased risks to Plaintiffs through its acts and omissions (a) by failing to disclose the true risks of repeated traumatic brain and head impacts in NFL football; (b) by failing to take appropriate steps to prevent, minimize, and/or mitigate repeated traumatic brain and head impacts in NFL football; and (c) by deliberately creating false scientific studies and spreading misinformation concerning the cause and effect relationship between brain trauma in NFL games and practices and latent neurodegenerative disorders and diseases.

77.     On information and belief, NFL policies and decisions relevant to the conduct alleged herein occurred primarily in the NFL corporate offices in New York City.

78.     On information and belief, those policies and decisions were part of a conspiracy whose objectives were to prevent players from having accurate and correct scientific information regarding the cause and effect relationship between (a) concussions and brain trauma

-23-

during NFL games and practices and (b) long-term neurological brain damage, including the early onset of dementia, memory loss, and Chronic Traumatic Encephalopathy ("CTE").

79.     Until 2010, the public and widely promoted position of the NFL was that concussions in NFL games and practices were not a long-term risk to players and unconnected (or probably unconnected) to brain degeneration and the brain disorders of early dementia and CTE.

80.     Long before 2010, the NFL voluntarily inserted itself into concussion research and public discussion. The NFL, therefore undertook voluntarily a duty (a) to make truthful statements; (b) not to wrongfully advance improper, biased, and falsified industry-generated studies; and (c) not to discredit well-researched and credible studies that came to a conclusion that did not comport with the NFL's financial and political interests.

81.     This duty extended not merely to NFL players, but also to all persons who play the game of football nationwide at every level; that is, millions of children, high school students, and college students.

82.     Third parties that conspired with the NFL in the tortious conduct alleged herein include, but are not limited to, paid physicians and health professionals and executives of NFL Properties, LLC.

## MASS ACTION AND JOINDER ALLEGATIONS

83.     Joinder is permissible under Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same occurrences, and questions of law and/or fact common to all Plaintiffs arise in this action.

84.     Common questions of law and fact will arise in this action, including but not limited to the following:

(a)     Whether the NFL, through its own voluntary undertaking, was

negligent in its response to the health effects of repetitive traumatic

brain injuries and/or concussions sustained by the Plaintiffs during

NFL games, practices and other activities;

(b)     Whether the NFL conspired to defraud the Plaintiffs by ignoring

and/or misrepresenting the risks of repetitive traumatic brain

injuries and/or concussions sustained by the Plaintiffs during NFL

games, practices and other activities; and

(c)     Whether the repetitive traumatic brain injuries and/or concussions

sustained by the Plaintiffs during NFL games, practices and other

activities cause, among other things, latent neurodegenerative brain

disorders, memory loss, and brain disease.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### The National Football League

85.     The NFL oversees America's most popular spectator sport, football, and

acts as a trade association for the benefit of the 32 independently-operated Teams.  The NFL's

average attendance per game in 2009 was 67,509.

86.     The NFL is engaged in assisting and guiding the operations of the Teams,

and the sale of tickets and telecast rights to the public for the exhibition of the individual and

collective talents of players such as the named former players (hereinafter the "Plaintiff-

Players").

87.     The NFL as a business collects annual receipts in excess of $9.3 billion.

88.     The NFL earns billions of dollars from its telecasting deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS ($622.5 million).

89.     Annually, the NFL redistributes approximately $4 billion in radio, television and digital earnings to the Teams or approximately $125 million per Team.  Those revenue numbers show no sign of declining and have increased since 2009.

90.     The NFL receives additional sources of revenue through companies that seek to associate their brands with the NFL.  The NFL has contracts with companies, such as Pepsi ($560 million over eight years, starting in 2004) and Gatorade ($45 million a year, plus marketing costs and free Gatorade for teams).  Verizon is paying $720 million over four years to be the league's wireless service provider.  Nike paid $1.1 billion to acquire the NFL's apparel sponsorship.  Previous partner Reebok had been selling $350 million annually in NFL-themed gear.

91.     On September 7, 2011, it was announced that the NFL signed a new 10-year $2.3 billion contract with Pepsi, which is one of the largest sponsorship deals in sports history.  It encompasses a number of Pepsi brands (Pepsi, Frito-Lay, Tropicana, Quaker Oats, and Gatorade).  This contract, combined with a number of other new sponsorships, ticket sales projections and TV ratings, means that the NFL is projecting record revenues of over $9.5 billion the 2011-2012 season.

92.     The Teams often collect $25-$30 million for stadium naming rights, such as MetLife Stadium in New Jersey and Lincoln Financial Field in Philadelphia, usually on 10-year naming right contracts.  Reliant Energy has a $10 million per year contract with the

Houston Texans for naming rights.  In Los Angeles, Farmers Insurance has promised $700 million over 30 years to name a stadium for a team that does not exist yet.

93.     The League has a $1.2 billion, six-year contract with beer sponsor Anheuser-Busch.

94.     Many Teams that are part of the NFL own in whole or in part the stadiums in which they play, which can be a source of major commercial value, as reflected in the following chart:

| STADIUM TEAM | OPENED | PRICE (2010 DOLLARS) | % PRIVATE |
|---|---|---|---|
| New Meadowlands, NY | 2010 | $1.6B | 100 |
| Cowboys Stadium, DAL | 2009 | $1.15B | 56 |
| Lucas Oil Field, IND | 2008 | $780M | 13 |
| U. of Phoenix Stadium, ARI | 2006 | $493M | 32 |
| Lincoln Financial, PHI | 2003 | $588M | 65 |
| Ford Field, DET | 2002 | $504M | 49 |
| Gillette Stadium, NE | 2002 | $373M | 100 |
| Reliant Stadium, HOU | 2002 | $526M | 39 |
| Qwest Field, SEA | 2002 | $422M | 29 |
| Invesco Field, DEN | 2001 | $683M | 39 |
| Heinz Field, PIT | 2001 | $312M | 16 |

95.     In 2010, more than 17 million fans passed through turnstiles operated by Teams and paid between $54.51 (Cleveland Browns) to $117.84 (New England Patriots) for the average game ticket.  Although the NFL will not allow others to see its financial records, financial results for the publicly-held Green Bay Packers ("Packers") offer some insight into the revenues Teams receive at the ticket office and concession stands.  In 2010, the Packers

received $60,059,646 in revenue from home and away game tickets plus private boxes.
Projected over 32 teams, the revenue was nearly $2 billion annually.  The Packers received $13
million from concessions, parking and local media in 2010, which translates to $416 million on
a league-wide basis.

96.     The NFL enjoys partial monopoly power through an anti-trust exemption
granted via the federal Sports Broadcasting Act that allows the NFL to sell television rights for all
32 teams as a single unit.

97.     A *Forbes* magazine article recently stated that 19 NFL franchises are
worth $1 billion or more.  Even the lowest-valued NFL Teams are worth approximately $800
million.  Over the last 15 years, the values of the franchises (i.e. Teams) in the NFL has risen 500
percent.

### The NFL's Influence

98.     In part because of its financial power and monopoly status in American
football, the NFL has enormous influence over physicians, trainers, coaches, professional
players, and amateur players at all levels of the game regarding many issues.  Those issues
include research and education regarding the diagnosis, treatment, and effects of injuries that
arise in both professional and amateur football practices, scrimmages, and games.

99.     The website www.nflhealthandsafety.com states that USA Football, the
sport's national governing body, "is the Official Youth Football Development Partner of the NFL
and the NFL Players Association (NFLPA)."

100.    USA Football leads the development of youth, high school and
international amateur football.  In addition, USA Football operates programs and builds
resources to address key health and safety issues in partnership with leading medical

-28-

organizations. The organization was endowed by the NFL and NFLPA through the NFL Youth

Football Fund in 2002. USA Football stands among the leaders in youth sports concussion

education, particularly for football.

101.   Over many decades, the NFL's influence has been expanded through its

use of the media. Through NFL films, the NFL Network, www.NFL.com, radio, and the internet

generally, the NFL has promoted NFL football via every mass communication medium

available.

102.   Part of the NFL's strategy to promote NFL football is: (a) to mythologize

players and Teams; (b) to glorify the accomplishments of individuals and Teams; and (c) to

glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal

and ferocious players and collisions.

103.   As a result of the NFL's strategy of glorifying the brutality and ferocity of

NFL football, the NFL has propagated the false myth that collisions of all kinds, including brutal

and ferocious collisions, many of which lead to short-term and long-term neurological damage to

current and former NFL players, are an acceptable and natural consequence of the game and a

measure of the courage and heroism of those involved in football at every level of the game.

104.   As a result of this strategy and the overwhelming influence of the NFL at

every level of the game, the NFL has generated for itself and others billions of dollars every year

by promoting the brutality and ferocity of the game, all of which has resulted in existing and

latent neurological damage to plaintiffs.

## The Scientific Evidence on Concussions and Head Injuries

105.   The American Association of Neurological Surgeons ("AANS") defines a

concussion as "a clinical syndrome characterized by an immediate and transient alteration in

brain function, including an alteration of mental status and level of consciousness, resulting from

mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as follows:

> as a blow or jolt to the head, or a penetrating head injury that
> disrupts the normal function of the brain. TBI can result when the
> head suddenly and violently hits an object, or when an object
> pierces the skull and enters brain tissue. Symptoms of a TBI can be
> mild, moderate or severe, depending on the extent of damage to the
> brain. Mild cases may result in a brief change in mental state or
> consciousness, while severe cases may result in extended periods
> of unconsciousness, coma or even death.

106.   The injury generally occurs when the head either accelerates rapidly and

then is stopped, or is spun rapidly. The results frequently include confusion, blurred vision,

memory loss, nausea and, sometimes, unconsciousness.

107.   Medical evidence has shown that symptoms of a traumatic brain injury or

concussion can reappear hours or days after the injury, showing that the injured party had not

healed from the initial blow.

108.   According to neurologists, once a person suffers a concussion, he is as

much as four times more likely to sustain a second one. Additionally, after several concussions,

a lesser blow may cause the injury, and the injured player requires more time to recover.

109.   Clinical and neuropathological studies by some of the nation's foremost

experts demonstrate that multiple concussions sustained during an NFL player's career cause

severe cognitive problems such as depression and early-onset dementia.

110.   Chronic Traumatic Encephalopathy (that is, CTE) is a progressive

degenerative disease of the brain found in athletes (and others) with a history of repetitive

concussions. Conclusive studies have shown this condition to be prevalent in retired

professional football players who have a history of head injury.

111.     Repetitive traumatic brain injury, including concussions, triggers the progressive degeneration of the brain tissue seen in CTE.  The symptoms associated with these degenerative changes can begin months, years, or even decades after the last concussion or end of the athlete's active involvement in the sport.  The progressive degeneration results in memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and, eventually, progressive dementia.

112.     The risks of repeated head impacts in certain sports and the onset of brain disease have been understood by medical professionals for decades.  In 1928, New Jersey pathologist, Harrison Martland, described the clinical spectrum of abnormalities found in "nearly one half of the fighters [boxers] who stayed in the game long enough."

113.     Follow-up studies on encephalopathy and repeated head impacts in sport were published in 1952.

114.     It was clear by the 1970's that the patterns of neurodegeneration associated with head impacts in boxing also occurred in other sports.

115.     In the early 1980's, studies at the University of Virginia and other institutions showed that persons, including football players, who suffered mild traumatic brain injuries showed pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

116.     The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

-31-

117.    Reports regarding these studies were published in peer-reviewed medical journals, the Wall Street Journal, and the New York Times.

118.    From 1931 to 2006, the National Center for Catastrophic Sport Injury Research has reported 1,006 direct and 683 indirect fatalities resulting from participation in all organized football in the United States; the annual number of indirect fatalities has remained near 9.0 per year.

119.    A 1994 Ball State University survey found that "players in the 1980s suffered serious injuries and underwent operations at twice the rate of those who played in the 1950s or earlier."

120.    In August 1994, running back Merril Hoge sustained a severe concussion in a pre-season game for which he was not properly treated.  In a subsequent game in October 1994, Hoge sustained an additional concussion which ended his career.  Hoge filed and won a lawsuit against the Bears' physician for, among other things, failing to inform Hoge of the consequences of returning to play.

121.    A study presented at the American Academy of Neurology's 52nd Annual Meeting in 2000 and authored principally by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 61% had suffered at least one concussion in their careers with 30 % of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had

difficulty with memory; 16% were unable to dress themselves; and 11% were unable to feed themselves; and (e) eight suffered from Alzheimer's disease.

122.    A study presented at the American Academy of Neurology's 52nd Annual Meeting in 2000 and authored principally by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 61% had suffered at least one concussion in their careers with 30 % of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; and 11% were unable to feed themselves; and (e) eight suffered from Alzheimer's disease.

123.    In 1999, former Pittsburgh Steeler and Hall of Fame inductee Mike Webster had filed with NFL's Retirement Plan ("NFL Plan") a request that he receive complete disability benefits based on the fact that he had sustained repeated and disabling head impacts while a player for the Steelers.  In 1999, Webster had submitted to the NFL Plan extensive medical reports and testimony that stated, among other things, that he, Webster, suffered from "traumatic or punch drunk encephalopathy [brain disease]" sustained from playing football that left Webster totally and permanently disabled as of 1991.

124.    The NFL Plan's own physician independently examined Webster and concluded that Webster was mentally "completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

125.    Although the NFL Plan gave Webster less than all of the benefits available, it did set the date of his onset of total disability at 1996, six years after Webster was no longer an active player.

126.    Webster died in 2002 at the age of fifty.  In December 2006, the Estate of Webster received an unpublished opinion from the United States Court of Appeals for the Fourth Circuit that affirmed the decision of the District Court that the administrator had wrongly denied him benefits.  In its unpublished opinion, the Fourth Circuit stated that the NFL Plan had acknowledged that the multiple head injuries Webster sustained during his playing career (1974 to 1990) "…had caused Webster eventually to suffer total and permanent mental disability…"

127.    Thus, as early as 1999, the NFL, through expert medical testimony presented by Webster and the NFL Plan itself, knew and accepted that repetitive traumatic brain injuries sustained by an NFL offensive lineman led to long-term encephalopathy and permanent mental disability.

128.    A 2001 report by Dr. Frederick Mueller that was published in the Journal of Athlete Training reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69 % of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, 69 football head-related injuries resulted in permanent disability.

129.    The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a clear correlation between NFL football and depression, dementia and other cognitive impairment.

130.    The chart on the following page, which was excerpted from an article in the 2010 *New England Journal of Medicine* entitled Traumatic Brain Injury—Football, Warfare, and Long-Term Effects, shows that even mild "traumatic brain injury" (stated in the chart as "TBI") can have lasting consequences that are manifest later in the football player's life.



**Spectrum of Pathologic Features and Outcomes of Traumatic Brain Injury (TBI).**

In the left inset, Bielschowsky silver stain shows intraneuronal and extracellular neurofibrillary tangles in temporal cortex from a retired boxer with dementia pugilistica.[1] The right inset shows diffuse Aβ plaque deposits in temporal cortex from a subject who sustained severe TBI.[2]

131.    To date, neuro-anatomists have performed autopsies on thirteen deceased NFL players who after their playing careers had exhibited signs of degenerative brain disease. Twelve of those players were found to have suffered from CTE.

### The NFL'S Response to the Concussion Issue

132.    The NFL's repetitive traumatic brain injury and concussion problem is not new.  In 1994, following the well-publicized retirements of NFL players Al Toon and Merril Hoge, both of whom had sustained serious head injuries while playing and developed post concussion syndrome, then-NFL Commissioner Paul Tagliabue established the MTBI Committee to study, among other things, post concussion syndrome in NFL players.

133.    At that time, the current NFL Commissioner, Roger Goodell, was the NFL's Vice President and Chief Operating Officer.

134.    Thus, with the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.  In doing so, the NFL assumed a duty to use reasonable care in:

        a)    the study of post-concussion syndrome;

        b)    the study of any kind of brain trauma relevant to the sport of football;

        c)    the use of information developed; and

        d)    the publication of data and/or pronouncements from the MTBI Committee.

135.    Rather than exercising reasonable care in these duties, the NFL engaged in fraud, which included a campaign of disinformation designed to (a) dispute accepted and valid

neuroscience regarding the connection between repetitive traumatic brain injury (concussions) and degenerative brain disease such as CTE, and (b) to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

136.    The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players caused by concussions and repetitive brain trauma received during their years as professional football players has been, until very recently, a conspiracy of deception and denial.  The NFL actively tried to conceal the extent of the concussion and brain trauma problem, the risk to the Plaintiffs, and the risks to anyone else who played football.

137.    Instead of naming a noted neurologist to chair the newly formed MTBI Committee, or at least a physician with extensive training and experience treating head injuries, Tagliabue appointed Elliot Pellman, a rheumatologist, who was a paid physician and trainer for the New York Jets.  Pellman's training was in the treatment of joints and muscles, not head injuries.

138.    The fact that Pellman was a paid physician for an NFL Team was an obvious conflict of interest.  At no time was Pellman independent of the NFL, because he was paid on an ongoing basis by an NFL Team.

139.    Pellman chaired the MTBI Committee from 1994 to 2007.

140.    Under Pellman, the MTBI Committee spearheaded a disinformation campaign.

141.    Pellman and two other scientists, Ira Casson ("Casson), a neurologist and David Viano ("Viano"), a biomedical engineer, worked to discredit scientific studies that linked head impacts and concussions received by NFL players to brain injuries.

-38-

142.    By 1994, when the NFL formed the MTBI Committee, scientists and neurologists alike were convinced that all concussions--even seemingly mild ones—were serious injuries that permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently.

143.    In 1994, the MTBI Committee began a purported study to determine the effect of concussions on the long-term health of retired NFL players.

144.    Thirteen years later, in a November 2007 report to Congress, NFL Commissioner Roger Goodell ("Goodell") characterized the study as an "**initial**" data collection phase and stated that "[w]e do not know when this study will be completed, although it is likely that a comprehensive study will require at least several years of research and analysis."

145.    In October of 2006, Pellman and Viano (both of whom were unqualified) published in *Neurological Focus* an interim report on the MTBI Committee's efforts that surveyed 12 years of data collection.  Pellman and Viano claimed to have analyzed "data on mild TBIs sustained between 1996 and 2001" and concluded that "...mild TBIs in professional football are not serious injuries".

146.    Their conclusion was against the weight of the scientific evidence and based on biased data collection techniques.  This was exposed in February 2007 by *ESPN The Magazine*, which reported that Pellman was selective in his use of injury reports, omitted large numbers of players from the concussion study, and presented findings that contradicted other scientific studies into the effects of concussions.

147.    Pellman concluded that returning to play after a concussion "does not involve significant risk of a second injury either in the same game or during the season." However, a 2003 NCAA study of 2,905 college football players found the opposite:  that those

-39-

who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury.

148.    Pellman and his group stated repeatedly that the NFL study showed "no evidence of worsening injury or chronic cumulative effects of multiple [mild traumatic brain injury] in NFL players."  However, the 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina found a link between multiple concussions and depression among former professional players with histories of concussions.  A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

149.    Moreover, the conclusions of the MTBI Committee completely contradicted the medical testimony regarding Mike Webster submitted to the NFL Plan in 1999, including testimony submitted by the NFL Plan's own paid expert.

150.    As the allegations in the foregoing paragraphs of this Complaint demonstrate, the research and medical conclusions concerning head injuries associated with the playing of football have a long history that contradicts the conclusions and pronouncements of the MTBI Committee.

151.    On Monday, February 1, 2010, Dr. Bennet Omalu ("Omalu"), then the Co-Director of the Brain Injury Institute at West Virginia University, spoke before members of the House Judiciary Committee at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football."  In his prepared testimony, Omalu stated (a) that the medical community has known about concussions and the effects of concussions in football for over a century, b) that every blow to the head is dangerous, and (c)

that repeated concussions and traumatic brain injury have the capacity to cause permanent brain damage.

152.    A 2000 University of North Carolina study by Kevin Guskiewicz, Ph.D., found that from 1977 to 1998, an annual average of 13 athletes suffered catastrophic injuries (primarily permanent paralysis) as the direct result of participation in football.  The study also found that between 1977 and 1998, 200 football players received a permanent cervical cord injury, and 66 sustained a permanent cerebral injury.  The results of the study suggested that regarding concussions, the brain is more susceptible to injury when it has not had enough time to recover from a first injury.  The finding is important, according to the study, because concussions can lead to, *inter alia*, permanent brain damage, memory loss, vision impairment or even death if not managed properly.

153.    According to Guskiewicz, recurrent brain injuries are more likely because injured players are returning to practice and to games too quickly after blows to the head. Guskiewicz observed that many Team health providers were not following medical guidelines that players should be symptom-free for several days before returning.

154.    A 2003 study partially authored by Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression. The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

155.    The NFL's MTBI Committee attacked these studies.

156.    In November of 2003, Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research.  Pellman called Guskiewicz in advance and questioned whether it was in the best interest of Guskiewicz to appear on the program.  On the program,

Pellman (a rheumatologist unqualified in the study of traumatic brain injury) stated unequivocally that he did not believe the results of the study led by Guskiewicz.

157.    In a 2005 follow-up study, Guskiewicz found that retired NFL players who sustained three or more concussions had a fivefold greater likelihood of suffering Mild Cognitive Impairment ("MCI") than retired NFL players who had no history of concussions. Guskiewicz based his conclusions on a survey of over 2,550 former NFL players.

158.    Later, in 2011, Guskiewicz received an award and was named a fellow by the John D. and Catherine T. McArthur Foundation, in part, because of his research and publications on mild traumatic brain injuries and concussions.

159.    Dr. Mark Lovell ("Lovell") of the MTBI Committee criticized the Guskiewicz study as lacking "scientific rigor."  The MTBI Committee also responded by presenting biased research derived from its ongoing survey of retired NFL players.  Pellman and other MTBI Committee members published a series of studies in *Neurosurgery,* a scholarly journal edited by Mike Apuzzo, the New York Giants' neurosurgical consultant.

160.    The results reported by Pellman and the MTBI Committee selectively excluded 850 baseline tests in their data, yet included only 655 baseline tests.  In a paper published in *Neurosurgery* in December 2004, Pellman and other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing.  They concluded that NFL players did not show a decline in brain function after suffering concussions.  Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.  The paper did not explain where the players in the study

-42-

groups came from specifically or why certain player data was included and that of hundreds of others was not.

161.    A November 2006 *ESPN The Magazine* article reported on how the MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players when studying the effects of concussion.

162.    Neuropsychologist William Barr (a consultant to the New York Jets and the MTBI Committee from New York University) voiced concern that Pellman might be selecting data that would downplay the effects of concussions.

163.    Later, Barr gave a lecture to the Brain Injury Association in New York and reported on a study of concussions in 3,000 college athletes.  In the lecture, Barr stated that the research showed that the best time to do neuropsychological testing was after the concussion symptoms had completely cleared, which was contrary to NFL practice.

164.    According to Barr, Pellman called him and ordered him not to make recommendations about the treatment about sports concussions without first discussing it with Pellman.  Pellman added that if Barr ever published his NFL data, Barr would hear from the NFL's lawyers.

165.    Barr protested, and Pellman fired him as a consultant to the Jets and MTBI Committee.  Barr later memorialized the conversation in a letter to the Dean of the NYU Medical School, Richard Levin.

166.    Robert Cantú, Chief of Neurosurgery and Director of Sports Medicine at Emerson Hospital in Concord, Massachusetts, and a Senior Editor at *Neurosurgery*, observed that the extremely small sample size and voluntary participation in the NFL's study suggested

-43-

there was bias in choosing the sample.  According to Cantú, no conclusions should be drawn from the NFL study.

167.    Cantú also stated that the NFL appeared to be primarily preparing a defense for when injured players eventually sued and seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

168.    Guskiewicz observed that the studies were "questionable industry-funded research."

169.    Between 2005 and 2007, Omalu and Cantú, who is also the Co-Director for the Center for the Study of Traumatic Encephalopathy ("CSTE") at the Boston University School of Medicine ("BUSM"), examined the brain tissue of three deceased NFL players:

(a) Mike Webster of the Pittsburgh Steelers, who died of heart failure at the age of 50;

(b) Terry Long of the Pittsburgh Steelers, who died at 45 after drinking antifreeze; and

(c) Andre Waters of the Philadelphia Eagles and Arizona Cardinals, who committed suicide at the age of 44.

170.    All three of these individuals suffered multiple concussions during their respective NFL careers.  All three exhibited symptoms of sharply deteriorated cognitive functions, paranoia, panic attacks, and depression.

171.    In articles published in *Neurosurgery* in 2005 and 2006, Omalu found that Webster's and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their professional playing years in the NFL.

172.    Cantú reached a similar conclusion as to Waters in an article published in *Neurosurgery* in 2007.

173.    In response to Omalu's article on Webster, Casson wrote a letter in July of 2005 to the editor of *Neurosurgery* asking that Omalu's article be retracted.

### Pellman's Removal From the MTBI Committee

174.    Pellman stepped down as the head of the MTBI Committee in February 2007.

175.    Guskiewicz, who is research director of UNC's Center for the Study of Retired Athletes, said at the time that Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

176.    Regarding the work of Pellman, Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions;" but "[Pellman] continued to say on the record that's not what they find and there's no truth to it."

177.    Pellman was replaced as chair of the MTBI Committee by Casson and Viano, who continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries sustained by NFL players during their playing days. When asked in 2007 whether concussions could lead to brain damage, dementia or depression, Casson denied the linkage six separate times.

178.    In June 2007, the NFL convened a Concussion Summit for team doctors and trainers.  Independent scientists, including Omalu, Cantu, and Guskiewicz, presented their research to the NFL.

-45-

179.    At the summit, Casson told team doctors and trainers that CTE has never been scientifically documented in football players. After reviewing five years of data of on-field concussions, the NFL concluded that there was **no evidence** for an increase in secondary brain injuries after a concussion. Two months later, the NFL issued a concussion pamphlet to players that claimed:

> [C]urrent research with professional athletes **has not shown** that having more than one or two concussions leads to permanent problems if each injury is managed properly. It is important to understand that **there is no magic number for how many concussions is too many**." (Emphasis added).

180.    The Plaintiffs relied on the pamphlet and all the other prior disinformation provided by the NFL, all of which was contrary to the findings of the independent scientists Guskiewicz, Cantú, Omalu and Bailes regarding the causal link between multiple concussions and cognitive decline.

181.    The NFL's conflict of interest and motive to suppress information regarding the risks of repetitive traumatic brain injuries and concussions was vividly demonstrated by Pellman's treatment of a concussion sustained by former star New York Jets player Wayne Chrebet. This occurred in 2003, during the same time period when Pellman chaired the MBTI Committee.

182.    In November 2003, Chrebet sustained a concussion from another player's knee to the back of his head. The impact left him face down on the field in an unconscious state for several minutes. Once Chrebet was on the sideline and conscious, Pellman administered tests. Pellman knew that Chrebet has sustained a concussion, but reportedly Chrebet performed adequately on standard memory tests. According to news reports, Pellman asked Chrebet some questions, including whether he was "okay". Chrebet responded that he was. Reportedly,

Pellman told Chrebet that "This is very important for your career" and sent Chrebet back into the game. Shortly thereafter, Chrebet was diagnosed with post-concussion syndrome and kept out of games for the remainder of the 2003 season.

183.    Today, Chrebet at 34 years old and reportedly suffers from depression and memory problems.

184.    The incident shows that the culture of football and the economic incentives within the NFL encourage NFL employees to return players to the field in the same game even after being knocked unconscious and sustaining significant concussions. The absence of star players like Chrebet for any significant length of time can and will adversely affect the competitiveness of the NFL Team for which the player plays, the Team's ticket and merchandise sales, and its overall revenue.

185.    Moreover, the majority of NFL player contracts do not guarantee any payment and require the player to pass physical and medical examinations at the beginning of every season. Further, college teams supply the NFL every year with hundreds of new players, all of whom seek to replace existing players. As a result, players are encouraged to under report repetitive traumatic brain injury and concussions and return to the field despite such injuries to maintain their positions on the field and their non-guaranteed contracts.

186.    In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part. The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population — including a rate of 19 times the normal rate for men ages 30 through 49."

187.    The NFL, which had commissioned the study, responded to its results by claiming that the study was incomplete.  NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose dementia.  Casson, the new co-chair of the MTBI Committee, implied that the Michigan study was inconclusive and stated that further work was required.

188.    In 2008, Dr. Ann McKee ("McKee") of the CSTE at BUSM examined the brain tissue of two other deceased NFL players: (a) John Grimsley ("Grimsley") of the Houston Oilers, who died of a gunshot wound at the age of 45; and (b) and Tom McHale ("McHale") of the Tampa Bay Buccaneers, Philadelphia Eagles and Miami Dolphins, who died of a drug overdose at the age of 45.  McKee found that Grimsley's and McHale's brain tissue exhibited indications of CTE and stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions."  McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

189.    In response, Casson criticized McKee's studies by characterizing each result as an isolated incident from which no conclusion could be drawn and said he would wait to comment further until McKee's research was published in a peer-reviewed journal.  When McKee's research was published in 2009, Casson asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether...repeat head impacts in professional football result in long[-]term brain damage."

190.    Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Omalu and other independent studies linking multiple NFL head injuries with cognitive decline.  Bailes recalled that the MTBI Committee's reaction to his presentation was adversarial:  "The Committee got mad...we got into it.  And I'm thinking,

-48-

'This is a…disease in America's most popular sport and how are its leaders responding? Alienate the scientist who found it? Refuse to accept the science coming from him?'"

### The Congressional Inquiry

191.    Shortly after the Michigan study was released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

192.    Cantú and McKee testified before the Judiciary Committee to discuss the long term impact of football-related head injuries.

193.    In the first hearing, in October 2009, Rep. Maxine Waters stated, "I believe you are an $8 billion organization that has failed in your responsibility to the players. We all know it's a dangerous sport.  Players are always going to get injured.  The only question is, are you going to pay for it?  I know that you dearly want to hold on to your profits.  I think it's the responsibility of Congress to look at your antitrust exemption and take it away."

194.    NFL Commissioner Roger Goodell admitted to the extraordinary power and influence of the NFL.  He testified at the hearing that the NFL is "fortunate to be the most popular spectator sport in America.  In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well. We must act in their best interests even if these young men never play professional football."

195.    Goodell also testified regarding the work of the MTBI Committee and stated that "[i]n the past 15 years, the N.F.L. has made significant investments in medical and biomechanical research.  All of that information has been made public, subjected to thorough and on-going peer review, published in leading journals, and distributed to the N.F.L.P.A. and their

medical consultants.  We have been open and transparent, and have invited dialogue throughout the medical community."

196.    When Representative Sanchez questioned Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias, Goodell evaded answering the questions.

197.    At the same hearing, NFLPA Executive Director DeMaurice Smith took a very different view from Goodell and testified:

> While this is the first N.F.L.-accepted study that demonstrated a connection between on-field injury and post career mental illness, there have been studies over the last decade highlighting that fact. Unfortunately, the N.F.L. has diminished those studies, urged the suppression of the findings and for years, moved slowly in an area where speed should have been the impetus.

198.    After the Congressional hearings, the NFLPA called for the removal of Casson as MTBI Committee co-chair and stated, "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

199.    Casson and Viano resigned as co-committee chairmen after the 2009 congressional hearings.  During the hearings, Casson was criticized for his "continued denials of any link among retired players between injuries sustained in professional football and heightened rates of dementia."

200.    Shortly after the Congressional hearings, the NFL announced that it would impose rules that required players who exhibit concussion symptoms to be removed from a game or practice and be barred from returning the same day.  In a change of policy, the NFL decided that "independent experts" would decide who returns to play and who has to sit out so their brain can heal.

201.    The change contradicted past statements by the MTBI Committee, which had recommended as safe the league's practice of returning players after a concussion.  In the journal *Neurosurgery* in 2005, for example, the MTBI Committee had stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

202.    In December 2009, NFL spokesman Aiello, who had vigorously denied the link between concussions and brain injury in September 2009, contradicted the NFL's previous pronouncements and stated that it was "quite obvious from the medical research that's been done that concussions can lead to long-term problems."

203.    Though "quite obvious" to sophisticated professionals involved in the study of concussions, the NFL, its MTBI Committee, and its so called "experts" deliberately obfuscated, denied, and attempted to repudiate accepted science for the previous fifteen years.

204.    On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, 26, who played in the NFL from 2004 to 2009, died after falling from the back of a pickup truck. Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed Henry with CTE.

205.    Two months early, in November 2009, the Associated Press surveyed one-hundred and sixty NFL players.  Thirty stated that they did not report or under-reported concussions and returned to play, even though suffering from blurred vision and other concussion symptoms.

206.     In January 2010, the House Judiciary Committee held further hearings on

Football Player Head Injuries.  Chairman Conyers noted that "until recently, the NFL had

minimized and disputed evidence linking head injuries to mental impairment in the future."

207.     The problem, however, continued.  Casson provided oral and written

testimony at the January 2010 hearings and continued to deny the validity of other studies,

stating that "[t]here is not enough valid, reliable or objective scientific evidence at present to

determine whether or not repeat head impacts in professional football result in long term brain

damage."

208.     Rep. Linda Sanchez criticized the NFL at the hearings and stated:

> I find it really ridiculous that he's saying that concussions don't
> cause long-term cognitive problems. I think most people you ask
> on the street would figure that repeated blows to the head aren't
> good for you.

209.     Rep. Sanchez further commented that:

> It seems to me that the N.F.L. has literally been dragging its feet on
> this issue until the past few years. Why did it take 15 years?

### The NFL's New Medical Committee

210.     In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and

Spine Medical Committee" (hereinafter the "Medical Committee") and announced that Pellman

would no longer be a member of the panel.  Drs. H. Hunt Batjer and Richard G. Ellenbogen were

selected to replace Casson and Viano.  The two new co-chairmen selected Dr. Mitchel S. Berger

to serve on the new committee.

211.     Under its new leadership, the Medical Committee admitted that data

collected by the NFL's former brain-injury leadership was "infected," and said that their

Committee should be assembled anew.  The Medical Committee formally requested that Pellman not speak at one of the Medical Committee's initial conferences.

212.    During a May 2010 hearing, the Congressional Committee made it plain to Batjer and Ellenbogen that the NFL: "[had] years of an infected system here, and your job is...to mop [it] up."

213.    Shortly after the May 2010 hearing, Batjer was quoted as saying, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us.  I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

214.    The NFL continued its deficient response to head injuries as the 2010 season began, and the league's concussion problems continued.  In the first game of the 2010 season, Philadelphia Eagles Middle Linebacker Stewart Bradley sustained a head injury, staggered when he attempted to walk, and collapsed.

215.    Former Dallas Cowboys Quarterback Troy Aikman, who had suffered multiple concussions as a player, was analyzing the game on television and commented that "[i]t's hard to imagine [Bradley] coming back into this game in light of what we just saw."  Four minutes later, however, Bradley was back in the game.

216.    In the same game, Eagles Quarterback Kevin Kolb was also sidelined by a concussion.  He, too, reentered the game.

217.    Recently, former New York Giants linebacker Harry Carson was asked about the concussion issue and was quoted as saying:

> Physically, I have aches and pains, but that comes with playing the
> game.  But if somebody tells you neurologically you could sustain

some kind of brain damage that will go with you the rest of your life.  If somebody had told me that a long time ago, I don't frankly think I would have [played].

## The NFL's New Player Safety Rules

218.    After decades of ignoring the issue and sixteen (16) years of a fraudulent campaign of disinformation, in October of 2010, the NFL finally addressed the concussion issue in a meaningful way.  On October 20, 2010, in the wake of a series of dangerous and flagrant hits resulting in concussions, the NFL levied fines totaling $175,000 on three players, James Harrison, Brandon Meriweather and Duanta Robinson.

219.    In discussing Meriweather's helmet to helmet hit on Baltimore Ravens Tight End Todd Heap, NFL Executive Vice President of Football Operations Ray Anderson stated:

> [I]n our view, the hit was flagrant and egregious.  *Effective immediately,* that's going to be looked at at a very aggressive level, which would include suspension without pay...What I would tell you is that if there are flagrant and egregious violations of our current rules, we will be enforcing, *effective immediately,* discipline at a higher level. (Emphasis added).

220.    That same day, NFL Commissioner Roger Goodell forwarded a memorandum to all 32 NFL teams with a message that was to be read to all players and coaches.  Also forwarded to each team was a video showing the types of hits that are against the NFL rules.

221.    The NFL memorandum provided, in part, that:

> Violations of the playing rules that unreasonably put the safety of another player in jeopardy have no place in the game, and that is especially true in the case of hits to the head and neck.  Accordingly, from this point forward, you should be clear on the following points: (1) Players are expected to play within the rules. Those who do not will face increased discipline, including suspensions, starting with the first offense; (2) Coaches are

expected to teach playing within the rules. Failure to do so will
subject both the coach and the employing club to discipline; (3)
Game officials have been directed to emphasize protecting players
from illegal and dangerous hits, and particularly from hits to the
head and neck. In appropriate cases, they have the authority to
eject players from a game.

222.    Two days later, the NFL sent a second memorandum to all teams

providing each coach with the names of the team's players who have multiple infractions of the

new NFL safety rules. NFL Spokesman Aiello stated regarding the second memorandum, "the

purpose was to provide an opportunity for the coach to give extra caution to those players to

abide by the safety rules."

223.    On February 17, 2011, former Chicago Bears and New York Giants player

Dave Duerson committed suicide. Only 50 at the time, Duerson had suffered months of

headaches, blurred vision, and faltering memory. After his death, Cantu determined that

Duerson was suffering from CTE.

224.    Before his death, Duerson wrote a final note that asked that his brain be

given to the NFL brain bank for evaluation.

225.    In connection with Duerson's death, the Duerson family made a public

statement that it was their hope that through research questions would be answered that would

lead to a safer game of football, from professional to Pop Warner.

226.    When this information was reported, NFLPA Executive Director

DeMaurice Smith stated that the fact that Duerson was suffering from CTE "makes it abundantly

clear what the cost of football is for the men who played and the families. It seems to me that

any decision or course of action that doesn't recognize that as the truth is not only perpetuating a

lie, but doing a disservice to what Dave feared and what he wanted to result from the donation of

his brain to science."

227.    Another example is provided by the case of John Mackey ("Mackey"), the former tight end of the Baltimore Colts, who died in July of 2011 and for whom the 88 Plan described below was named. Mackey was diagnosed with front temporal lobe dementia in 2007, forcing him to live full-time in an assisted living facility.

228.    The NFLPA refused to pay a disability income to him because it claimed that there was no proven direct link between brain injury and NFL game participation. When the 88 Plan came into being, Mackey received payments, but far less than his family's costs. Mackey made less than a total of $500,000 during his decade-long NFL career.

229.    In October 2011, Dr. Berger of the NFL's Medical Committee announced that a new study was in the planning process and disassociated himself and the Medical Committee from the previous work of the MTBI Committee.  Addressing problems with the previous NFL long-range study, a *New York Times* article reported that Dr. Berger said "There was no science in that."  Dr. Berger further stated that data from the previous NFL study would not be used. "We're really moving on from that data.  There's really nothing we can do with that data in terms of how it was collected and assessed."

230.    In November 2011, the NFL's injury and safety panel issued a directive telling its game officials to watch closely for concussion symptoms in players. The directive came 10 days after San Diego Guard Kris Dielman sustained a head injury during a game on Oct. 23, finished playing in the game, and was not assessed until afterward.  On the team's flight home, Dielman suffered a grand mal seizure.

## The NFL's Power and Influence

231.    The NFL possesses monopoly power over American Football.  As such, it also possesses overwhelming influence over the research and education relating to football injuries, and that influence reaches every person who plays football or who has a family member who plays football.

232.    The NFL voluntarily and purposefully asserted this influence over physicians, trainers, coaches, individuals with brain damage such as the Plaintiffs, children and teenagers who play the game, and parents and families of football players.  Those persons reasonably relied on the NFL to act with prudence and care, not to ignore a serious health problem, and not to propagate false and misleading information about that problem.  The NFL owed a duty to everyone of the foregoing persons, including the Plaintiffs, in the following respects:

a)    The NFL owed a duty of reasonable care to protect Plaintiff-Players on the playing field;

b)    The NFL owed a duty of reasonable care to Plaintiff-Players to educate them and other players in the NFL about CTE and/or concussion injury;

c)    The NFL owed a duty of reasonable care to Plaintiff-Players to educate trainers, physicians, and coaches about CTE and/or concussion injury;

d)    The NFL owed a duty of reasonable care to Plaintiff-Players to have in place strict return-to-play guidelines to prevent CTE and/or concussion injury;

e)    The NFL owed a duty of reasonable care to Plaintiff-Players to promote a "whistleblower" system where teammates would bring to the attention of a trainer, physician or coach that another player had sustained concussion injury;

        f)       The NFL owed a duty of reasonable care to Plaintiff-Players to design rules to eliminate the risk of concussion during games and/or practices;

        g)       The NFL owed a duty of reasonable care to Plaintiff-Players to minimize the risk of concussion during games and/or practices;

        h)       The NFL owed a duty of reasonable care to and their respective families to promote valid research into and cure for CTE and the effects of concussion injury over a period of time; and

        i)       The NFL owed a duty of reasonable care to local sports organizations, all American Rules Football leagues, players at all levels of the game, and the public at large to protect against the long-term effects of repetitive traumatic brain injury and/or concussions.

## The NFL's Knowledge of the Risks

233.    For decades, the NFL has known that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression and CTE and its related symptoms.

234.    Throughout the past century and through the present, medical literature in the United States and other industrialized countries has included case reports, studies, reviews, and peer-reviewed articles relating to and discussing the harmful effect on humans, and particularly players of American football, of repeated blows to the head.  These publications were all available and easily accessible to all Defendants, who at all times were in a superior position of knowledge and power as compared to the Plaintiff-Players.

235.    The NFL, in fact, had acknowledged in its dispute with Mike Webster over disability benefits that the multiple head injuries Webster sustained during his playing

-58-

career (1974 to 1990) "...had caused Webster eventually to suffer total and permanent mental disability..." However, until June of 2010, the NFL concealed these facts from other players, coaches, trainers, and the public and actively spread disinformation to prevent the true facts from coming to light.

236.    The NFL knew of the risks, but voluntarily undertook measures that did not sufficiently or adequately protect against the risks:

a)    In 1977, the NFL enacted an inadequate rule that prohibited players from slapping the head of another player during play.  This rule was referred to as the "Deacon Jones Rule," named after the Rams' defensive end who frequently used this technique;

b)    In 1977, the NFL enacted an inadequate rule that prohibited Offensive Linemen from thrusting their hands into a defender's neck, face, or head;

c)    In 1980, the NFL enacted an inadequate rule that prohibited players from using their helmets to butt, spear, or ram an opponent;

d)    In 1980, the NFL enacted inadequate rule changes that prohibited players from directly striking, swinging, or clubbing the head, neck, or face ("personal foul");

e)    In 1983, the NFL enacted an inadequate rule that prohibited players from using a helmet as a weapon to strike or hit an opponent;

f)    In 1988, the NFL enacted an inadequate rule that prohibited defensive players from hitting quarterbacks below the waist while they are still in the pocket. (The rule was unofficially called the "Andre Waters Rule" based upon a hit that Waters placed on Los Angeles Rams quarterback Jim Everett in 1988); and

g)    Following the 2004-2005 season, the NFL's Competition Committee reviewed video of the entire season and concluded that the horse-collar tackle

resulted in six serious injuries. On May 23, 2005, the NFL owners voted 27-5 to ban such tackles. The ban states that a horse-collar tackle is an open-field tackle in which a defender uses the shoulder pads to immediately bring a ball carrier down.

237. None of the foregoing measures adequately addressed repetitive traumatic brain injuries and concussions.

238. On August 14, 2007, while the MTBI Committee was still spreading misinformation, the NFL issued inadequate and insufficient concussion guidelines, many of which stemmed from an NFL conference in June of 2007 involving team trainers and doctors. Those inadequate guidelines were sent to all current players and team personnel.

239. The insufficient and inadequate guidelines included an informational pamphlet provided to all current NFL players to aid in identifying symptoms of a concussion. This information was later withdrawn by one of the outside counsel of the NFL in a separate letter to its disability plan. The NFL's August 14, 2007 press release denied that "more than one or two concussions" leads to permanent problems.

240. In a statement issued by the NFL on August 14, 2007, NFL Commissioner Goodell, introduced the NFL's 2007 concussion guidelines by saying, "We want to make sure all NFL players, coaches and staff members are fully informed and take advantage of the most up-to-date information and resources as we continue to study the long-term impact of concussions."

241. The NFL Commissioner also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

242.     The NFL, however, later acknowledged that the 2007 guidelines were inadequate and insufficient.  As a result, the NFL enacted more strict regulations to handle concussions starting in the 2009 season.  Specifically, the NFL announced new rules on managing concussions requiring players who exhibit any significant concussion signs to be removed from a game or practice and be barred from returning the same day.

243.     Nevertheless, it was not until June of 2010 that the NFL warned any player of the long-term risks associated with multiple concussions, including dementia, memory loss, CTE, and other symptoms.

244.     The NFL's conduct stands in sharp contrast to what has been done or promulgated by other sports or medical bodies.

245.     For example, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: "[b]oxers that suffered concussion by KO, should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including not limited to KO's, and should not compete in a boxing match in less than 75 days."

246.     The Second International Conference on Concussion in Sport met in Prague in 2004 and released the following statement: "[w]hen a player shows ANY symptoms or signs of a concussion ... the player should not be allowed to return to play in the current game or practice ... When in doubt, sit them out!" (Emphasis added). This directive echoed the position taken by the First International Conference on Concussion in Sport, held in Vienna in 2001.

247.     As ESPN reported in 2006, "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

248.    Another example is provided by the National Collegiate Athletic Association ("NCAA"), which also recognized inexcusably late the link between head impacts and brain injuries, and which did not taking affirmative action on this until 2010. The NCAA is the subject of at least two class actions suit for this tardiness. Nevertheless, once it did act, it did so in a manner that was more decisive than the NFL.

249.    The NCAA's webpage on concussion-related resources (see <http://www.ncaa.org/wps/portal/ncaahome?WCM_GLOBAL_CONTEXT=/ ncaa/NCAA/Academics+and+Athletes/Personal+Welfare/Health+and+Safety/Concussion>) indicates that in an educational partnership with the Centers for Disease Control and Prevention, the NCAA has supplied each member college campus with two posters and two sets of fact sheets addressing concussion awareness, prevention, and management. It has issued the "NCAA Sports Medicine Handbook – Guideline on Concussions in the Athlete," which recommends best practices. The NCAA also requires each member college to develop a "Concussion Management Plan." One exemplar plan offered on the NCAA's website is the University of Georgia Athletic Association's ("UGAA") "Concussion Management Guidelines," which requires, among other things, a concussion management plan baseline assessments of all student-athletes in any sport, whether or not they have a history of concussions or concussion-like symptoms.

### The NFL's Conduct Rises Beyond Mere Negligence

250.    The aforementioned acts and omissions of the NFL shows that the NFL acted with callous indifference to the duty it voluntarily assumed to the Plaintiff-Players and players at every level of the game.

251.    The NFL acted willfully, wantonly, egregiously, with reckless abandon, and with a high degree of moral culpability. The NFL knew that a substantial risk of permanent

and debilitating physical and mental harm to the Plaintiffs existed in connection with repeated

concussive blows to the head; that is, the danger of irreversible brain-damage and/or dementia.

The NFL willfully and deliberately disregarded the safety of the Plaintiffs and players at every

level of the game by (a) failing to address or disclose this substantial short-term and long-term

risk associated with concussions; (b) by actively engaging in a campaign of misinformation on

the risks and dangers of repetitive traumatic brain injuries and concussions; and (c) by

promulgating rules within in the NFL Teams that permitted injured players to return to the

playing fields immediately or soon after they had sustained a traumatic brain injury and/or a

concussion.

## COUNT I

### ACTION FOR DECLARATORY RELIEF -- LIABILITY

252.    Plaintiffs repeat and re-allege each of the allegations contained in the

foregoing paragraphs.

253.    There is a case and controversy among Plaintiffs on the one hand and the

NFL on the other.

254.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaration as to the

following:

a)      that the Defendant NFL knew or reasonably should have known

that the repeated traumatic brain and head impacts, as well as concussions, suffered by the

Plaintiff-Players while playing NFL football were likely to put them at excess risk to

neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease

or similar cognitive-impairing conditions;

b)      that the Defendant NFL had a duty to advise Plaintiff-Players of these medical risks;

c)      that Defendant NFL willfully and intentionally concealed from and misled the Plaintiff-Players concerning these medical risks; and

d)      that Defendant NFL recklessly endangered Plaintiff-Players.

## COUNT II

### CONSPIRACY TO DEFRAUD

255.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

256.    The Defendant NFL actively and deliberately agreed and conspired with its independent contractors, and/or agents to minimize, discount, and reject the casual connection between multiple concussions suffered by present and former NFL players and neurodegenerative disease and other mental health symptoms.

257.    The common goal of the co-conspirators was to discourage talented players from retiring and to persuade all players to return to football games regardless of the concussions and brain trauma they sustained.  Rather than implementing a rational science-based protocol that would force players to not play in games (or possibly retire), the NFL conspired with members of the MTBI Committee to conceal and/or misrepresent scientific research and the truth of the risks to players.

258.    The MTBI Committee was an instrumentality of the conspiracy.  Upon its creation, the MTBI Committee was highly publicized as the NFL's purported good faith effort to search for the truth and report its findings to the general public, players, and NFLPA.

259.    The MTBI Committee, however, acted to refute and criticize the proof showing the causal link between multiple traumatic brain injuries and permanent cognitive decline

and to create competing studies that were biased, against the weight of scientific knowledge and opinion, and purposefully designed to justify the NFL's publicly stated opinion that there was no causal link between multiple traumatic brain injuries and permanent cognitive decline.

260. The MTBI Committee was created and authorized by the executive leadership of the NFL.

261. Instead of hiring unbiased scientists of unimpeachable integrity and national reputations, the NFL leadership, based in New York, selected Pellman to Chair of the MTBI Committee.

262. Pellman was and is a Team trainer paid by the New York Jets.

263. Under the leadership of Pellman (and even after Pellman resigned), the MTBI Committee purposefully misrepresented to the Plaintiff-Players, players at every level of the game, and the public generally the true risks associated with repetitive traumatic brain injuries.

264. Other third parties who conspired with the NFL include, but are not limited to, NFL Properties, LLC, and various as yet un-named persons in leadership positions in the NFL, and NFL Properties, LLC.

265. On information and belief, the agreements among the co-conspirators occurred primarily in the NFL corporate offices in New York City.

266. On information and belief, the agreements among the co-conspirators lead to policies and decisions by the NFL whose objectives were to prevent players from having accurate and correct scientific information regarding the cause and effect relationship between (a) concussions and brain trauma during NFL games and practices and (b) long-term neurological brain damage, including the early onset of dementia and Chronic Traumatic Encephalopathy ("CTE").

267.    As a result, the public and widely promoted position of the NFL was that concussions in NFL games and practices were not a long-term risk to players and unconnected to degenerative brain disease and disorders.

268.    The NFL conspiracy, therefore, caused or contributed to the injuries and increased risks to Plaintiff-Players through the NFL's acts and omissions (a) by failing to disclose the true risks of repeated traumatic brain and head impacts in NFL football; (b) by failing to take appropriate steps to minimize and mitigate repetitive traumatic brain injuries and concussions in NFL football games and practices; and (c) by deliberately creating industry-funded misleading scientific studies and spreading misinformation concerning the cause and effect relationship between brain trauma in NFL games and practices and latent neurodegenerative disorders and diseases.

269.    The misconduct by the Defendants was a proximate cause of the chronic injuries and damages suffered by the Plaintiffs.

270.    As a result of the Defendants' misconduct, Defendants are jointly and severally liable to Plaintiffs.

## COUNT III

## FRAUDULENT CONCEALMENT

271.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

272.    Defendant NFL concealed facts and information which caused all the Plaintiff-Players to become exposed to the harm referenced above.

273.    As a result of the Defendants' misconduct as alleged herein, Defendants are liable to Plaintiff-Players.

274.    As a proximate cause of the concealment of the Defendant NFL, each

Plaintiff-Player suffered harm described above and each has suffered damages that are

continuing in nature and as yet have not been fully ascertained.

## COUNT IV

## FRAUD

275.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint

as if fully set forth herein.

276.    From 1994 through June of 2010, the NFL made material

misrepresentations to its players, former players, the Congress, and the public at large that there

was no link between concussions and later life neuro-cognitive damage and brain injury,

including CTE and its related symptoms.

277.    Agents of the NFL and the NFL itself intended to defraud, among others,

the Plaintiff-Players in this action.

278.    The Plaintiff-Players justifiably and reasonably relied on these

misrepresentations to their detriment.

279.    As a result of the Defendants' misconduct as alleged herein, Defendants

are liable to Plaintiff-Players.

280.    The Plaintiff-Players were damaged by the misrepresentations and now

require, among other things, home care, loss of consortium, loss of employment, medical costs,

and pain and suffering.

281.    As a result of the injuries Plaintiffs have suffered and will suffer, they are

entitled to damages from the NFL in an amount reasonably anticipated to exceed the

jurisdictional minimum of $75,000 for each Plaintiff-Player and Plaintiff-Spouse.

## COUNT V

## NEGLIGENT MISREPRESENTATION

282.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

283.   Defendant NFL ignored and/or misrepresented the dangers that the Plaintiff-Players faced in returning to action too quickly after sustaining a head injury.  For decades the NFL ignored and/or suppressed evidence that repetitive trauma to the head during NFL practices and games resulted in short-term and long-term neurological damage to NFL players.

284.   In addition, beginning in 1994, the MTBI Committee made public statements, published articles, and issued the concussion pamphlet to its players, which the NFL knew or should have known were misleading, because they downplayed and obfuscated the true risks of concussions to NFL players.

285.   The MTBI Committee made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings and information issued to Plaintiff-Players.

286.   The Defendant's misrepresentations included statements that present and former NFL players were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering head trauma.

287.   The Defendants' misrepresentations also included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of concussions and head injuries sustained regularly by NFL players.

288.    The Defendants made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of knowledge, that the Plaintiff-Players faced health problems if they returned to a game too soon.

289.    The Defendants knew or should have known the misleading nature of the statements when they were made.

290.    The Defendants made the misrepresentations and actively concealed information with the intention that the Plaintiff-Players would rely on the misrepresentations or omissions in selecting a course of action.

291.    As a result of the Defendants' misconduct as alleged herein, Defendants are liable to Plaintiffs.

292.    As a direct and proximate result of the Defendant's negligence, careless and negligent conduct, and omissions described herein, each of the individually named Plaintiff-Players have suffered serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, emotional distress, and loss of consortium.

## COUNT VI

## NEGLIGENCE

293.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein at length.

294.    The NFL has historically assumed an independent and voluntary duty to invoke rules that protect the health and safety of its players,

295.    Throughout its history, the NFL has consistently adopted and exercised a duty to protect the health and safety of its players by implementing rules, policies, and regulations.

296.    By enacting such rules, policies, and regulations, the NFL has repeatedly confirmed its duty to take reasonable and prudent action to protect the health and safety of its players in the face of a known and foreseeable risk.

297.    The NFL breached its duty to its players, including the Plaintiff-Players, by failing to implement mandatory rules that would prevent a player who suffered a traumatic brain injury and/or concussion from re-entering a football game or practice.

298.    The NFL breached the duty it voluntarily assumed by the following failures:

a)    Failure to institute acclimation requirements or procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

b)    Failure to regulate and monitor practices, games, equipment, and medical care so as to minimize the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiff-Players;

c)    Failure to require that an adequate concussive brain injury history be taken of all NFL players;

d)    Failure to accurately diagnose and record concussive brain injuries so the condition can be treated adequately and timely;

e)    Failure to establish league-wide guidelines, policies, and procedures regarding the identification and treatment of concussive brain injury;

-70-

f)      Failure to establish protective, responsible, and medically-based return-to

play criteria for players who have suffered concussive brain injury;

g)      Failure to license and approve the best equipment available that will

reduce the risk of concussive brain injury; and

h)      Failure to provide complete, current, and competent information and

directions to NFL athletic trainers, physicians, and coaches regarding concussive

brain injuries and its prevention, symptoms, and treatment.

299.    As a result of the Defendants' misconduct as alleged herein, Defendants

are liable to Plaintiffs.

300.    Had the NFL taken the necessary steps to oversee and protect the NFL

players, including the Plaintiff-Players, by developing and implementing necessary guidelines,

policies and procedures, providing reasonably safe helmets, and educating and training all

persons involved with the NFL Teams in the recognition, prevention, and treatment of

concussive brain injuries, the Plaintiff-Players would not have suffered from their current and

progressive conditions, which include, but are not limited to, long-term brain damage, memory

loss, early on-set of dementia, and depression.

301.    Under all of the above circumstances, it was foreseeable that the NFL's

violations of its duties would cause or substantially contribute to the personal injuries suffered by

the Plaintiff-Players and the Plaintiff-Spouses.

302.    The NFL committed acts of omission and commission, which collectively

and severally, constituted negligence.  The NFL's negligence was a proximate and producing

cause of the injuries and other damages suffered by the Plaintiff-Players.

303.   As a result of the injuries, the Plaintiff-Players are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000 for each Plaintiff Player.

## COUNT VII

## LOSS OF CONSORTIUM

304.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

305.   As a result of the Defendants' misconduct as alleged herein, Defendants are liable to the Plaintiff-Spouses.

306.   As a direct and proximate result of the carelessness, negligence, and recklessness of Defendant NFL and of the aforesaid injuries to their husbands, the Plaintiff-Spouses have been damaged as follows:

a)   They have been and will continue to be deprived of the services, society and companionship of their husbands;

b)   They will have been and will continue to be required to spend money for medical care and household care for the treatment of their husbands; and

c)   They have been and will continue to be deprived of the earnings of their husbands.

307.   As a result of the injuries to Plaintiff-Players, the Plaintiff-Spouses are entitled to damages from the Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000 for each Plaintiff-Spouse.

## COUNT VIII

## MEDICAL MONITORING

308.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

309.     The Plaintiff-Players experienced repeated traumatic brain and head impacts, including concussions, during their respective NFL careers that increased their risk to neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions.

310.     Defendant NFL was fully aware of the danger of exposing the Plaintiff-Players to further injury by allowing them to play with these injuries or to play prior to the time that such injuries could heal.  Until June 2010, the Defendant NFL failed to warn players of these medical risks.  Instead, Defendant NFL attempted to conceal the harmful effects of football-related concussions from all players prior to that time.  Furthermore, Defendant NFL breached its duty of reasonable and ordinary care to the Plaintiff-Players by failing to protect their physical and mental health and failing to provide necessary, adequate, and truthful safety information.

311.     As proximate result of Defendant NFL's tortious conduct, the Plaintiff-Players have experienced an increased risk of developing serious latent neurodegenerative disorders and diseases including but not limited to CTE, Alzheimer's disease, and other cognitive-impairing conditions.

312.     Monitoring procedures exist that comport with contemporary scientific principles and make early detection of cognitive impairment possible.  Such monitoring includes baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, which will prevent or mitigate the adverse consequences of the latent neurodegenerative disorders and

diseases associated with the repeated traumatic brain and head impacts described herein. Furthermore, such monitoring is not available pursuant to the normal medical treatment proscribed for adult males.

313.   Plaintiff-Players therefore seek an injunction creating a Court-supervised, NFL-funded medical monitoring regime for the Plaintiff-Players that will (a) monitor, detect, and diagnose as quickly as possible brain damage and/or other related conditions that have arisen from the repetitive traumatic brain injuries and/or concussions sustained by the Plaintiff-Players and (b) provide adequate treatment in the event a neurodegenerative disorder or disease is diagnosed.

314.   The medical monitoring regime should include, *inter alia*:

a.   a trust fund in an amount to be determined to pay for the medical monitoring of all NFL players as frequently and appropriately as necessary; and

b.   notification to all Plaintiff-Players in writing (in addition to notices to each Team member of the NFL and health care providers) that specific former and current players require frequent medical monitoring; and

c.   a trust fund in an amount to be determined to pay for the medical treatment of the Plaintiff-Players diagnosed with brain damage and/or other related conditions that have arisen from the repetitive traumatic brain injuries and/or concussions they sustained.

315.   Plaintiff-Players have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to repetitive traumatic brain impacts, concussions, and/or sub-concussive injuries. Without a Court approved and/or established medical monitoring program as described herein, the Plaintiff-Players will continue to face an unreasonable risk of injury and disability.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment as follows:

A.      With respect to Count I, granting the declaratory relief requested pursuant to 28 USC § 2201;

B.      With respect to Count II through VII, granting an award of compensatory and punitive damages where applicable;

C.      With respect to Count VIII, granting an injunction and/or other equitable relief for the requested medical monitoring and treatment of all Plaintiff-Players.

D.      With respect to all counts, awarding Plaintiffs such other and further relief as may be appropriate, including prejudgment interest, costs and attorneys fees.

## JURY DEMANDED

Plaintiffs hereby demand a trial by jury on all matters so triable.

Signed this 4th day of September, 2012.

LOCKS LAW FIRM


Gene Locks, Esquire (PA ID No. 12969)
Michael B. Leh, Esquire (PA ID No. 42962)
David D. Langfitt, Esquire (PA ID No. 66588)
601 Walnut Street, Suite 720 East
Philadelphia, PA 19106
215-893-0100 (tel.)
215-893-3444 (fax)
glocks@lockslaw.com
mleh@lockslaw.com
dlangfitt@lockslaw.com

and

Craig R. Mitnick, Esquire
Managing Partner
Mitnick Law Offices
Thirty-Five Kings Highway East,
Haddonfield, New Jersey 08033
856.427.9000 (tel.)
F. 856.427.0360 (fax)
craig@crmtrust.com


*Attorneys for Plaintiffs*